***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner, and the briefs and oral arguments before the Full Commission. Finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in the Pre-trial Agreement and at the hearing as: *Page 2 
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter of these proceedings.
2. All parties are correctly designated, and there is no question as to misjoinder or nonjoinder of any parties.
3. All parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
4. An employment relationship existed between the parties on May 11, 1983, February 6, 1986, November 23, 1999, and December 7, 2000.
5. The following are undisputed facts:
 a. Both the plaintiff and the defendants are subject to the North Carolina Workers' Compensation Act.
 b. The defendant-employer, employed the plaintiff on May 11, 1983, February 6, 1986, November 29, 1999, and December 7, 2000.
 c. I.C. No. 993995: Right and Left Knees. The plaintiff sustained compensable injuries by accident on or about May 11, 1983, when she stepped on the side of a band cover and heard her right knee pop, and on or about February 6, 1986, when she hit her left knee on a metal wrap holder while working for the defendant-employer. The defendants accepted both injuries as compensable under I.C. File No. 993995. The defendants accepted the right knee injury on a Form 21 dated June 12, 1985. The defendants accepted the left knee injury on a Form 21 dated *Page 3 
March 16, 1987. The plaintiff missed the following time periods from work for her right and left knee injuries under I.C. No. 993995:
 (1). Right knee. The plaintiff was out of work for right knee arthroscopy from May 6, 1985 through May 19, 1985, for which the plaintiff received one (1) week of temporary total disability compensation at the rate of $186.93 per week, reflecting an average weekly wage of $280.40.
 (2). Left knee. The plaintiff was out of work for left knee arthroscopy from February 26, 1987 through March 31, 1987, for which the plaintiff received four and six-seventh (4 6/7) weeks of compensation at the rate of $206.66 per week, reflecting an average weekly wage of $310.00.
 (3). Right knee. The plaintiff was out of work for right knee arthroscopy from June 14, 1989 through July 10, 1989, for which the plaintiff received three and four-sevenths (3 4/7) weeks of compensation at the rate of $186.67 per week, reflecting an average weekly wage of $280.40.
 (4). Right and left knees. The plaintiff was out of work for bilateral knee arthroscopies from February 9, 1990 through March 8, 1990, for which the plaintiff received four (4) weeks of compensation at the rate of $186.93 per week, reflecting an average weekly wage of $280.40. *Page 4 
 (5). Right and left knees. The plaintiff was out of work for left knee arthroscopy from January 21, 1993 through March 25, 1993, and for right knee arthroscopy performed on March 9, 1993, and received nine (9) weeks of compensation.
 (6). Right knee. The plaintiff was out of work for right knee arthroscopy from August 3, 1995 through August 28, 1995, for which the plaintiff received compensation.
 (7). Right and left knees. The plaintiff was out of work for bilateral knee cortisone injections on March 7, 1996, for which the plaintiff received compensation.
 (8.) The plaintiff has yet to receive permanent disability compensation.
 d. IC No. 055024: Left Hand and Neck. The plaintiff sustained compensable injuries by accident on or about November 23, 1999, while working for the defendant-employer, when a sterilizer truck struck her, knocked her against another sterilizer truck, and the plaintiff fell down, sustaining injury to her face, left hand, and cervical spine. The defendants accepted this injury under I.C. No. 055024 on a Form 60 dated July 3, 2001.
 (1). The defendants listed an average weekly wage of $474.80 and a compensation rate of $316.28 on the Form 60 dated July 3, 2001.
 (2). The plaintiff submits that the average weekly wage is $488.27 and the compensation rate is $325.51 per a Form 22 completed by employer, dated April 28, 2000. *Page 5 
 (3). The plaintiff was out of work for left hand surgery from June 11, 2001 to January 4, 2002 for which the plaintiff was paid 29 5/7 weeks of compensation at the rate of $316.28 per week, reflecting an average weekly wage of $474.40.
 (4). The plaintiff returned to work January 5, 2002.
 (5). The plaintiff worked part time from January 5, 2002 through March 24, 2002 but did not receive temporary partial disability compensation.
 (6). The plaintiff was out of work from March 25, 2002 through June 18, 2002 but did not receive temporary total disability compensation.
 (7). The plaintiff was out of work (she had surgery in IC 103564 on June 19, 2002; and in IC 055024 on August 15, 2002) from June 19, 2002 to November 15, 2002 for which time period the plaintiff was paid compensation at the rate of $316.28 per week.
 (8). The plaintiff did not thereafter work for this employer or any other employer.
 (9). The plaintiff has yet to receive permanent disability compensation.
 (10). The plaintiff claims facial disfigurement. The plaintiff has yet to receive permanent disfigurement compensation.
 e. IC No. 103564: Right Arm and Shoulder. The plaintiff sustained a compensable injury by accident on or about December 7, 2000 while working for the defendant-employer. When she was getting a bundle off *Page 6 
of a pallet, the bundle slipped and she felt pain in her right arm and shoulder as she tried to grab the bundle. The injury was accepted as compensable under IC No. 103564.
 (1). The defendant accepted this claim, IC No. 103564, on a Form 62 dated March 8, 2001.
 (2). The defendants listed the plaintiff' compensation rate as $488.40 on the Form 62. This appears to be a mistake. This was in fact the average weekly wage for this injury.
 (3). The plaintiff was out of work for right shoulder rotator cuff and biceps tendon surgery from December 19, 2000 through January 11, 2001, for which the plaintiff received three and three-sevenths (3 3/7) weeks of compensation at the rate of $325.62 per week, reflecting an average weekly wage of $488.43.
 (4). The plaintiff was out of work from March 2, 2001 through June 10, 2001, for which the plaintiff received 14 3/7 weeks of compensation at the rate of $325.62 per week, reflecting an average weekly wage of $488.43.
 f. Rule seven (7) of the North Carolina Industrial Commission Mediated Settlement Conference Rules shall govern payment or reimbursement of the mediation fee.
 *********** The following documentary evidence was received into evidence as: *Page 7 
 EXHIBITS
Stipulated Exhibit #1: Notebook containing medical records, and IC forms.
Depositions: Dr. Cammarata, Dr. Earwood, Dr. Fleck, Dr. Hanson, and Dr. Hoski.
 *********** ISSUES
1. To what amount of past, present and future medical and disability compensation is the plaintiff entitled?
2. To what amount of credit is the defendant-employer entitled for short term disability and long term disability benefits paid?
3. Is the plaintiff entitled to disfigurement compensation?
 ***********
Based upon the foregoing stipulations and the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was a 61-year-old female with a ninth (9th) grade education. Her prior work history consisted of employment as a winder operator in a hosiery mill for 12 years, and as a cutting machine operator at a metal-working plant for one (1) year. She started working for the defendant-employer in June 1979, and worked with the defendant-employer for approximately 26 years. During her employment with the defendant-employer, the plaintiff sustained a series of admittedly compensable injuries by accident as set forth in detail in the above stipulations.
2. At the time of all of the injuries which she sustained in these cases, the plaintiff was working as a carton erector, opening and securing corrugated cartons, then placing them on *Page 8 
an overhead conveyor, ready to accept the bags of intravenous saline solution which are produced at the defendant-employer's plant. After her final injury, and after 10 of 11 surgeries, the defendant-employer moved the plaintiff to a different job.
3. This proceeding concerns three (3) I.C. files and four (4) dates of injury. On May 11, 1983, the plaintiff sustained a compensable injury to her right knee, and on February 6, 1986, the plaintiff sustained a compensable injury to her left knee, both of which required multiple surgeries. These injuries received a single file number, I.C. No. 993995. On November 23, 1999, the plaintiff sustained compensable injuries to her left hand, cervical spine, and face, which injuries received I.C. No. 055024. On December 7, 2000, the plaintiff sustained compensable injuries to her right arm and shoulder, which injuries received I.C. No. 103564.
4. The treatment and healing periods of the plaintiff's injuries overlapped. A recommendation from Dr. Welliver on April 14, 1999 for right total knee replacement was pending when the plaintiff injured her left hand, spine, and face on November 23, 1999. The plaintiff received medical treatment for the November 23, 1999 injury both before and after the December 7, 2000 right arm and shoulder injuries.
5. Different injuries affected some of the plaintiff's same body parts. The neck injury of November 23, 1999 caused pain in the plaintiff's shoulders, as did the shoulder injury of December 7, 2000. Some doctors rendered treatment for more than one (1) injury. Dr. Earwood is the plaintiff's family practice physician, but also served as an authorized treating physician in monitoring and prescribing medication for the plaintiff's neck and shoulder pain in I.C. No. 055024. Dr. Cammarata performed surgery on the right arm in I.C. No. 103564, and also on the left hand in I.C. No. 055024.
 I.C. No. 993995 — right and left knees *Page 9 
6. On May 11, 1983, the plaintiff suffered a work-related torn medial meniscus of the right knee. She continued to work, but had a right knee arthroscopy performed by Dr. Jarrett on May 6, 1985, two (2) years after the injury. The plaintiff returned to work on May 20, 1985, 13 days after surgery. On June 12, 1985, the defendants accepted the right knee injury as compensable on a Form 21 agreement.
7. The plaintiff injured her left knee on February 6, 1986. Just over one (1) year later, on February 26, 1987, she had a left knee arthroscopy performed by Dr. Jarrett. She returned to work on April 1, 1987 after five (5) weeks. The left knee injury was accepted as compensable on a Form 21 agreement dated March 16, 1987, filed under I.C. No. 993995 and listing an average weekly wage of $310.00 with a compensation rate of $206.66.
8. On June 14, 1989, the plaintiff had a second (2nd) right knee arthroscopy done by Dr. Jarrett. She returned to work July 10, 1989, after four (4) weeks.
9. On February 9, 1990, the plaintiff had two (2) surgeries performed by Dr. Welliver, one (1) on the left knee and one (1) on the right knee. Again she returned to work after four (4) weeks. The plaintiff was paid temporary total disability compensation at the lower rate established for the right knee of $186.93, rather than at the higher rate established for the left knee of $206.66.
10. On January 22, 1993, the plaintiff had left knee arthroscopy surgery performed by Dr. Welliver, and on March 9, 1993, she again had a right knee arthroscopy performed by Dr. Welliver. This surgery was the fourth (4th) surgery to the plaintiff's right knee and the third (3rd) surgery on her left knee. The plaintiff returned to work on March 26, 1993, two (2) weeks after the right knee arthroscopy. *Page 10 
11. On August 4, 1995, the plaintiff had a fifth (5th) right knee arthroscopy performed by Dr. Welliver. She returned to work on August 25, 1995, after 21 days. On April 14, 1999, and again on April 27, 2000, Dr. Welliver recommended that the plaintiff undergo a total knee replacement on the right. Dr. Jay Jansen agreed with Dr. Welliver's recommendation for total right knee replacement after evaluating the plaintiff in February 2002 upon a referral from Dr. Cammarata.
 I.C. No. 055023 — left hand, neck and face.
12. On November 23, 1999, the plaintiff suffered her third (3rd) injury by accident at work when she was struck by a sterilizer truck and knocked into a another sterilizer truck. She suffered injuries to her left hand, cervical spine, and face. These injuries received I.C. No. 055023. Dr. Joseph Chung treated the plaintiff for these injuries from November 26, 1999 through March 9, 2000. Initially, he sutured a long laceration on the bridge of the plaintiff's nose, and noted pain and exquisite tenderness at the right posterior neck and in the left thumb.
13. Dr. Chung noted on October 25, 2001 that the laceration above the bridge of the plaintiff's nose had healed leaving a visible scar. This scar was examined by Dr. Andrew Davis of Morganton Eye Physicians on November 14, 2001, who wrote that the plaintiff had vertical webbing extending from her scar toward the mid brow.
14. The Deputy Commissioner viewed the scar on the plaintiff's face at close range at hearing, who noted for the record that the plaintiff has a thin scar that runs around the inside of the eye socket on the right side of the nose, and then goes down about three (3) inches, ending at the center line of the nose. The plaintiff initially lost one (1) day from work due to this injury. The plaintiff is seeking compensation for facial disfigurement for this injury. *Page 11 
15. On April 28, 2000 the defendant completed a Form 22 for the November 23, 1999 injury by accident, I.C. No. 055023. The Form 22 shows earnings of $25,389.84 over 366 days, for an average weekly wage of $485.60, yielding a compensation rate of $323.74.
16. On May 30, 2000 the plaintiff saw Dr. James Hoski, who diagnosed a cervical sprain or strain and noted that the plaintiff had reached maximum medical improvement as of that time. He assigned a four (4) percent permanent partial impairment rating to the plaintiff's back (neck). Dr. Hoski also noted that the plaintiff had continuing bilateral pain in the trapezial region, neck pain, and occasional upper extremity radiculopathy, greater on the left than on the right. Dr. Hoski recommended that the plaintiff be treated with anti-inflammatories and physical therapy, rather than surgery. The plaintiff was paid compensation at the rate $316.28 per week for the injury on November 23, 1999, reported in I.C. 055023.
17. The plaintiff saw Dr. Angelo Cammarata beginning October 30, 2000 for pain, weakness and instability in her left thumb resulting from her November 23, 1999 injury by accident.
 I.C. No. 103564 — right arm
18. On December 7, 2000 the plaintiff suffered her fourth (4th) injury by accident at work. While loading a bundle of cartons into her machine, the bundle fell and she tried to grab it and felt pain in her right arm and shoulder. The plant nurse was of the impression that the plaintiff had pulled a muscle. The plaintiff continued to work until December 19, 2000, when her injury resulted in the need for surgery which was performed by Dr. Cammarata to repair her ruptured biceps tendon (surgery number nine (9)). During surgery, Dr. Cammarata discovered that the plaintiff had also sustained a massive rotator cuff tear of her right shoulder as well as the complete rupture and retraction of the biceps tendon. *Page 12 
19. Twenty-three days after surgery the plaintiff returned to light-duty work on January 12, 2001. She left work and compensation was reinstated on March 2, 2001 when her employer was unable to accommodate her light duty restrictions at the time.
 Continuation of I.C. No. 055023 — left hand, neck, andface.
20. On May 28, 2001, while the plaintiff was still out of work following her shoulder surgery and resulting light duty work restrictions which the defendant-employer could not accommodate, Dr. Cammarata again evaluated her left thumb. On June 11, 2001, Dr. Cammarata performed surgery on the plaintiff's left thumb. He fused the CMC joint and attempted a reconstruction of the MP joint, utilizing a portion of the flexor carpi radialis (FCR) tendon, half of which was dissected off and used to cushion the MP joint. Starting June 11, 2001, the plaintiff was paid temporary total disability at a compensation rate of $316.28.
21. The defendant accepted the plaintiff's injury by accident of November 23, 1999 to her left hand, neck, and face on a Form 60 dated July 3, 2001.
22. On October 19, 2001, Dr. Cammarata placed the plaintiff at maximum medical improvement for her right arm and left hand injuries, indicating that she could return to work at a sedentary level, with grasping limited to "occasional" with the left arm. He also noted that she should not use her right arm to reach forward, and that overhead work should be limited to "occasional" with both arms.
 Return to Work
23. The plaintiff could not return to her job as carton erector. The defendant-employer procured a written description of a job proposed for the plaintiff. The Physical Demands Analysis for the job, which was performed October 3, 2001 indicated that the plaintiff would be working eight hours per day, inspecting units on a moving conveyor, removing *Page 13 
defective units from a conveyor, and pulling approximately three hundred defective bags from the line in an eight-hour shift (an average of 37.5 bags per hour), exerting a pulling force of 10 to 30 pounds each time. The Physical Demands Analysis indicated that the job required reaching above the shoulder up to 33 percent of the time, reaching below shoulder-level, reaching across and reaching to floor-level, each, up to 33 percent of the time.
24. The defendant-employer obtained a Job Analysis performed by Mike Piercy, a certified vocational evaluator, of the packing inspector job dated November 15, 2001, which indicated that the number of bags to be removed per hour is 10 to 25, and that the employee can stand on a platform to reach the bags. The other job description did not address reaching above shoulder level and the force required to pull each bag. It did indicate that the reaching distance was 15 inches.
25. Dr. Cammarata reviewed the November 15, 2001 job analysis, and approved the inspector job for the plaintiff on November 30, 2001.
26. The plaintiff returned to work in the inspection job on January 5, 2002, working the 12-hour per day weekend shift. She worked until March 24, 2002.
27. Mr. Dennis Noblitt was a witness for the defendant. He testified that he was the current supervisor of the department in which the inspection job is located. He testified that the number of bags to be inspected is 80,000 to 120,000 per shift, or 120 to 180 bags per minute. He testified that 450 to 475 defective bags were pulled in an 11 ½ hour shift in the fourth (4th) quarter of 2002 (over 40 per hour) but that there were higher numbers of defective bags pulled in early 2002.
28. The video of the inspection job, which the defendant supplied pursuant an Order of June 7, 2006 is five (5) minutes, 18 seconds in length, and shows 12 bags pulled. This is an *Page 14 
average of one bag each 25.5 seconds or 135 bags per hour. The operator is shown reaching at over-head level to pull down each bag using two (2) hands to grasp and pull the bags.
29. Three (3) witnesses, Ms. JoAnne Taylor, Mr. Dennis Noblitt, and the plaintiff, described the inspector's need to extend his/her neck to look upward to see the bags as they run by on the line. Neither the October 3, 2001 nor the November 15, 2001 written job description mentions the need to look upward to perform the inspection job.
30. The plaintiff testified that the inspector needs to sit low enough to see the bottom of the bags, but high enough to reach the defective bags, and that she sat with her head bent backwards and to the side in order to inspect the bags. She was required to see the batch designation print under the overwrap to make sure it was readable. The plaintiff testified that the inspector had to look up at an angle because of reflections coming off the overwrap. She further testified that she could not stand in order to bring her shoulder up even with the bags, because if her shoulders were even with the bags, she could not see what she needed to see in order to inspect the bags. The bags needed to be inspected from a height of above shoulder level to allow the inspector to see through the bottom of the bags. Some bags were harder to remove than others and had to be forcefully jerked loose from the clamp holding them on the line.
31. Ms. Taylor testified that she had to look up at the bags to see the defects, holding her head at an angle because of the reflection from the backlighting. She testified she was trained to do it that way. She also testified she had to pull hard with both hands to get defective bags off the line and that the chairs were often broken and could not be adjusted to suitable height.
32. Mr. Piercy, the vocational evaluator, asked if the employer would furnish the plaintiff with an adjustable chair, so that she would not have to raise her arm above shoulder *Page 15 
level. The personnel manager told Mr. Piercy that an adjustable chair would be provided, but later told the plaintiff that the defendant-employer could not get her a chair without getting chairs for the whole automation and packing areas, and the defendant-employer was not going to do that. The plaintiff never got the adjustable chair.
33. The plaintiff's supervisor, Mr. Noblitt, agreed that different workers have to turn different ways to see the bags; that regulations required backlighting with 150-watt bulbs; and that glare was a problem when viewing the bags.
34. For three (3) nights, the plaintiff kept a contemporaneous written record of the number of bags that she pulled from the line. On February 16, 2002, she pulled an average of 52 bags per hour for the 11.5 hours of the shift. On February 24, 2002 she pulled an average of 49.6 bags per hour over her shift. On March 3, 2002 she pulled an average of 64.6 bags per hour.
 Recurrent disability from cervical spine injury
35. On February 18, 2002, the plaintiff saw Dr. Cammarata, who reiterated that she should not be pulling more than 25 bags per hour. He noted that she showed a possible upper extremity radicular component from the cervical spine for which he recommended that she have epidural steroid injections. He also referred her for further evaluation for a total knee replacement.
36. The plaintiff had problems with severe pain, tingling, numbness and loss of feeling in her arms when performing the inspection job. On February 25, 2002, she saw Dr. Earwood and asked him to determine whether she should continue to perform the inspection job. On February 28, 2002 he wrote that due to her multiple problems, the plaintiff needed to take early retirement due to disability. Dr. Earwood explained that early retirement was a term the plaintiff used, and he considered that to be disability, not working. *Page 16 
37. The plaintiff continued to work in the inspection job until March 24, 2002.
38. As the plaintiff continued to work, her symptoms worsened and her right hand would become "completely dead" according to her testimony. Plaintiff told her supervisor about her condition and he reported it to the human resource supervisor, Mr. Steve Connell. The supervisor reported to the plaintiff that, "Steve said I'd work itself out." On the last night the plaintiff worked (March 24, 2002), her arm condition got so bad that she took early leave and went home.
39. On April 2, 2002 the plaintiff saw Dr. Earwood, reporting tingling and numbness in both arms and neck pain. Dr. Earwood ordered an MRI of the neck. Dr. Earwood wrote a "To Whom It May Concern" letter stating his opinion that the plaintiff's cervical disc problems had grown worse, and recommending that she be re-evaluated by Dr. Hoski. He further recommended that, pending re-evaluation, the plaintiff should not use her arms to perform any reaching, grasping, lifting or repetitive work. The Full Commission finds as fact that as a result of these restrictions imposed by Dr. Earwood and the plaintiff's own symptoms of pain in her neck and tingling and numbness in both arms, she was incapable of performing the inspector's job.
40. The MRI ordered by Dr. Earwood, which was done April 9, 2002, showed narrowing of the nerve openings at C5-6 with joint hypertrophy, more severe on the right. These findings correlated with the symptoms Dr. Earwood had observed upon examination of the plaintiff, namely the pain and numbness in the plaintiff's neck and down her arms, worse on the right side.
41. On April 23, 2002, the plaintiff returned to Dr. Cammarata who noted that her main complaint was pain in the neck with radiation into both upper extremities, worsening as she *Page 17 
worked. Dr. Cammarata noted that the MRI revealed cervical spondylosis with nerve root impingement at the C5-6 and C6-7 levels bilaterally, more severe on the right, which correlated with her symptoms. Dr. Cammarata agreed with Dr. Earwood's plan of further workup and re-evaluation by Dr. Hoski, and recommended a transfer of the plaintiff's orthopedic care to Dr. Hoski.
42. Dr. Hoski saw the plaintiff on June 19, 2002, noting loss of sensation in her right hand. His impression was cervical radiculopathy from C5-6, C6-7, progressive, and cervical spinal stenosis C5-6, C6-7, progressive. He concluded to a reasonable degree of medical probability that the plaintiff's current symptoms were due to her November 23, 1999 work related injury. Dr. Hoski opined that the plaintiff had a change in her condition and she was no longer at maximum medical improvement. He was of the opinion that surgical intervention was warranted and recommended that the plaintiff remain out of work until after her surgery. The plaintiff was paid temporary total disability benefits starting June 19, 2002.
43. On August 15, 2002, Dr. Hoski performed a cervical disckectomy and fusion at C5-6 and C6-7 on the plaintiff (surgery number 11). On October 30, 2002, the plaintiff returned to Dr. Hoski for post-surgical follow-up. He restricted her from any prolonged flexion or extension of the neck. He specified that the plaintiff should not keep her neck extended or flexed for more than one-third (1/3) of the day. He released her to return to work with these restrictions as of November 15, 2002.
44. The plaintiff saw Dr. Earwood on November 1, 2002, and he and the plaintiff again discussed what she called early retirement which Dr. Earwood defined as medical retirement or disability. On November 7, 2002 Dr. Earwood wrote to the defendant-employer regarding the plaintiff's inability to work. In that letter, Dr. Earwood reiterated his opinion *Page 18 
concerning the plaintiff's inability to work, noting her multiple injuries; multiple surgeries, her restrictions on the use of her neck, hands, shoulders and legs; her continuing problems with her knees, neck, shoulder and hands; her repeated returns to work early after multiple surgeries; her ongoing need for pain medications; and her problems with stress, lack of concentration and lack of sleep associated with her injuries.
45. At his deposition Dr. Earwood confirmed that his opinion to a reasonable medical certainty was that, as of November 7, 2002, the plaintiff was not able to perform the inspection job which required reaching and pulling bags off the line at the defendant-employer's plant. The Full Commission gives great weight to Dr. Earwood's opinion.
46. On December 10, 2002, the plaintiff returned early to Dr. Hoski, reporting constant pain in her right peri-scapular region, with difficulty using her arms over her head or holding her right arm up on the steering wheel to drive. Dr. Hoski referred the plaintiff to Dr. Laura Fleck for recommendations regarding activities, pain management techniques, and functional restoration.
47. The plaintiff first saw Dr. Fleck, a board-certified neurologist, on December 19, 2002. Dr. Fleck diagnosed neck pain and functional limitation caused by probable injury to her cervical facet joints, significant myofascial pain in the neck and between the shoulders and an interruption of normal activities, ability to work, and sleeping.
48. After her initial evaluation of the plaintiff, Dr. Fleck was of the opinion that the plaintiff should be restricted to sedentary work, meaning occasional lifting of up to 10 pounds, and that she should be restricted from lifting from below her knee, above the shoulder, doing prolonged work at or above the shoulder level, or climbing. *Page 19 
49. On January 16, 2003, Dr. Fleck repeated those restrictions, adding that the plaintiff needed to change positions frequently and avoid prolonged standing or walking. Dr. Fleck was of the opinion that the plaintiff needed to be able to avoid an isolated fixed position of either the neck or her upper extremity. Under comments, Dr. Fleck wrote, "If these restrictions cannot be accommodated, patient cannot work."
50. Both Dr. Fleck and Dr. Hoski saw the plaintiff on February 12, 2003. On that date, Dr. Fleck referred the plaintiff to Dr. Hansen for diagnostic cervical facet injections to prove that the pain was coming from the facet joint and to provide a therapeutic procedure called a rhizotomy, which treats the damaged facet nerve. These procedures were diagnostically successful, demonstrating that the plaintiff's pain was coming from the facet joints as suspected, but did not provide any significant subjective or functional gain.
51. Dr. Fleck saw the plaintiff again on September 8, 2003. The option of physical therapy in the form of work hardening was considered, but Dr. Fleck was of the opinion that work hardening would pose a threat to the plaintiff, and might aggravate her symptoms.
52. The defendant-employer did not provide to the plaintiff a job that would accommodate her medical restrictions as given by Dr. Fleck.
53. Dr. Fleck opined and the Full Commission finds as fact that when the plaintiff's neck was injured, she injured her disc and her facet joints and developed myofascial symptoms, which were not handled by the surgery.
54. The Full Commission finds based on the greater weight of the evidence that on November 23, 1999 the plaintiff suffered an injury to her cervical spine consisting of injury to the intervertebral joints, including discs, at C5-6 and C6-7 and to the facet joints and the nerves. *Page 20 
Although the cervical fusion surgery of August 15, 2002 alleviated the symptoms of the disc injuries, the disabling effects of the facet and myofascial injuries persisted after the surgery.
55. Dr. Fleck last saw the plaintiff on October 6, 2003. After consultation with Dr. Hoski, Dr. Fleck assigned a 15 percent permanent partial impairment rating to the plaintiff's spine. That rating included the surgical component, the facet component and the myofascial symptoms.
56. Beginning November 17, 2003, the defendant approved Dr. Earwood to provide care for the plaintiff as an authorized treating physician, and Dr. Earwood stayed in that role until June of 2006. Dr. Earwood prescribed a controlled release narcotic to assist the plaintiff in controlling her pain. He never saw any indication that she was abusing narcotics.
57. Dr. Earwood testified that between November 7, 2002, when he wrote to the employer stating that the plaintiff could no longer work, and November 20, 2006, the last note in his record, the plaintiff's problems remained constant. The thumb of her left hand was locking; her arms were numb and tingling and were going to sleep; her right knee kept her awake at night with pain, she had popping pain and stiffness; she had pain and tingling down both arms; her trapezius muscles were stiff and sore to the touch; she was very stiff in her knees and hips; her arms would go numb at times with driving; her right leg hurt worse than her left; she could not lift any heavy weight and had quite a bit of trouble with her pain.
58. Dr. Earwood testified that he does not customarily assign a disability rating to different body parts, but he is called upon almost every day to give his opinion as to whether or not someone can work. It is part of his daily practice to complete certificates of disability, and he has been doing so since 1991. *Page 21 
59. The Full Commission gives greater weight to the opinion of Dr. Earwood on the extent of the plaintiff's disability and finds as fact that as November 7, 2002 and continuing to the present, the plaintiff has been and is unable to work as a result of her compensable injuries. To the extent that Dr. Fleck and Dr. Hoski opined that the plaintiff may be capable of some work within the restrictions they provided, the Full Commission finds that it would be futile for the plaintiff to look for employment considering her multiple medical conditions resulting primarily from her work-related injuries, her resulting physical restrictions due to her work related injuries, and her vocational factors such as her advanced age (64), her limited education (9th grade), and her prior work history.
 Short-term and long-term disability
60. The defendant asserted that short-term disability benefits were paid to the plaintiff, but did not document the dates and amounts of short-term disability payments.
61. The plaintiff agreed that premiums on the short-term disability policy were paid by her employer. She testified that she paid the premiums herself on the long-term disability policy, through payroll deduction. Her pay stubs, admitted into evidence corroborate this testimony. Short-term disability benefits are not paid until after an employee has been out of work a certain number of days.
 Benefits due
62. When the plaintiff returned to work at the inspection job on January 5, 2002, she was working 23 hours per week in a two (2) day weekend shift, for which she received an hourly rate of $11.59, yielding a maximum weekly wage of $266.57, which was less than her applicable average weekly *Page 22 
wage of $488.43 in I.C. No. 103564, entitling her to temporary partial disability compensation.
63. In the Pre-Trial Order signed by the parties and the Deputy Commissioner, entered on June 12, 2006, the parties stipulated that the defendants had yet to pay temporary partial disability compensation to the plaintiff for the period from January 5, 2002 through March 24, 2002.
64. Wage records produced by the defendants show that the plaintiff received wages of $2,362.41 from January 5, 2002 through March 24, 2002, a period of 11 2/7 weeks. For this period, the plaintiff is due temporary partial disability compensation in the amount of $2,099.92, [($488.43 — $266.57) x (2/3) x (112/7)].
65. Based on the plaintiff's credible testimony that she became totally unable to work during her shift on March 24, 2002 and could not thereafter return to work, and on the opinions given by Dr. Earwood, the Full Commission finds that the plaintiff was unable to work during the period from March 25, 2002 through June 18, 2002 when her compensation was reinstated. The plaintiff is entitled to temporary total disability compensation at the compensation rate of $316.28 for this period
66. Plaintiff has established that she has been totally disabled as set forth above since her compensation was reinstated on June 18, 2002 and she is entitled to continuing temporary total disability compensation.
67. The plaintiff has not received compensation for all waiting periods for her injuries.
68. The plaintiff is due payment for permanent partial impairment for those injuries to specific body parts which are unrelated to her current disability for which she reached maximum medical improvement and returned to work. The plaintiff is due the following compensation: *Page 23 
 a. As a result of the injury to plaintiff's right arm for which she last returned to work on June 10, 2001 and reached maximum medical improvement on October 19, 2001, the plaintiff retained an impairment rating of 10 percent in IC No. 103564, for which she is due 24 weeks of compensation at the rate of $325.62 per week;
 b. As of October 19, 2001, the plaintiff retained an impairment rating of 10 percent of the left hand, for which she is due 20 weeks of compensation at $323.74 per week;
 c. As of November 14, 2001, the plaintiff retained a visible facial scar on the bridge of her nose, which has vertical webbing extending from her scar toward the mid brow. Reasonable compensation for that scar is $600.00.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. As a result of her admittedly compensable injuries by accident, the plaintiff is entitled to receive compensation payments as detailed below. N.C. Gen. Stat. § 97-2(6).
2. The plaintiff is due payment for permanent partial impairment for those injuries to specific body parts for which she reached maximum medical improvement, returned to work and the payment would not constitute double recovery of benefits. Hill v. Hanes Corp.,319 N.C. 167,353 S.E.2d 392 (1987); N.C. Gen. Stat. § 97-31. The plaintiff is due the following compensation: *Page 24 
 a. As of October 19, 2001, the plaintiff retained an impairment rating of 10 percent of the right arm in IC No. 103564, for which she is due 24 weeks of compensation at the rate of $325.62 per week;
 b. As of October 19, 2001, the plaintiff retained an impairment rating of 10 percent of the left hand, for which she is due 20 weeks of compensation at $323.74 per week;
 c. As of November 14, 2001, the plaintiff retained a visible facial scar on the bridge of her nose, which has vertical webbing extending from her scar toward the mid brow. Reasonable compensation for that scar is $600.00.
3. The plaintiff has yet to reach the point of maximum medical improvement with respect to her knee injuries. Dr. Welliver and Dr. Jansen both recommended a total replacement of the right knee. Both knee injuries are governed by Hyler v. GTE Products Co., 333 N.C. 258,425 S.E.2d 698 (1993), and not by N.C. Gen. Stat. § 97-25.1, which did not become enacted until after those injuries occurred. The defendants shall provide such medical compensation for the plaintiff's knee injuries as may reasonably be required to effect a cure, give relief, or lessen her disability, including right knee replacement.
4. The plaintiff returned to work in the inspection job at a reduced wage, entitling her to temporary partial disability compensation for establishing disability under the fourth (4th) prong ofRussell during the period she worked from January 5, 2002 through March 24, 2002. Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993).
5. The plaintiff is entitled to temporary total disability compensation at the compensation rate of $316.28 for the period of March 25, 2002 through June 18, 2002. The plaintiff's own testimony that she could no longer do the inspection job as of March 24, 2002, *Page 25 
coupled with Dr. Earwood's opinion on April 2, 2002 that the plaintiff should not use her arms to perform any reaching, grasping, lifting or repetitive work until she was re-evaluated by Dr. Hoski for her worsening cervical disk problems established that the plaintiff was medically unable to perform her job as an inspector for the defendant-employer and again became disabled due to her November 23, 1999 cervical injury. The plaintiff's subsequent re-evaluation by Dr. Hoski, which led to cervical surgery, further establishes that she was totally disabled from working due to work-related medical reasons beginning March 25, 2002. Id.
6. The defendants stipulated that they did not pay any temporary partial disability compensation to the plaintiff from January 5, 2002 through March 24, 2002, and did not pay any temporary total disability from March 25, 2002 through June 18, 2002. "A stipulation approved by the Commission is binding absent a showing that there has been error due to fraud, misrepresentation, undue influence or mistake." Tucker v.Workable Company, 129 N.C. App. 695, 701; 501 S.E.2d 360, 365 (1998).
7. Although Dr. Fleck and Dr. Hoski did not totally remove the plaintiff from work after she reached maximum medical improvement, Dr. Earwood's testimony that as of November 7, 2002 the plaintiff could not work, is given greater weight, and establishes that the plaintiff has been totally disabled from any employment since November 7, 2002 for work-related medical reasons. Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
8. The plaintiff's decision to retire after she could not continue working does not constitute a refusal to work. Stroud v. CaswellCenter, 124 N.C. App. 653, 478 S.E.2d 234 (1996). *Page 26 
9 The defendants did not document the dates and amounts of short-term disability payments made to the plaintiff. The defendants are entitled to a credit for short-term disability paid to the plaintiff after producing sufficient documentation of payments made. The defendants are not entitled to a credit for long-term disability payments.See, Foster v. Western Electric, 320 N.C. 113, 357 S.E. 2d 670 (1987).
10. The plaintiff is due additional temporary partial and temporary total disability compensation for periods of disability not paid, and for the periods for which she was underpaid. N.C. Gen. Stat. §§ 97-30,97-29.
11. The plaintiff is entitled to all reasonable medical treatment necessitated by her compensable injuries, which is designed to effect a cure, provide relief or lessen her disability, including future medical treatment. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fee approved below, the defendants shall pay the plaintiff the following amounts for permanent partial impairment, per N.C. Gen. Stat. § 97-31:
 a. For the 10 percent impairment of the right arm, 24 weeks at the rate of $325.62;
 b. For the10 percent impairment of the left hand, 20 weeks at the rate of $323.74;
 c. For facial disfigurement, the defendants shall pay the plaintiff the amount of $600.00 *Page 27 
3. Subject to the attorney's fee approved below, the defendants shall pay total disability compensation to the plaintiff as follows:
 a. The defendant shall pay total disability compensation for the waiting period for the right knee equal to $186.93;
 b. To make up an underpayment for four (4) weeks preceding March 9, 1990, the defendants shall pay $78.92;
 c. To make up an underpayment from June 11, 2001 through January 4, 2002, the defendants shall pay 29 5/7 weeks at the rate of $7.46;
 d. The defendants shall pay temporary total disability compensation from March 25, 2002 through June 18, 2002, equal to 12 2/7 weeks, at the rate of $323.74, plus interest, from the date of hearing before the Deputy Commissioner;
 e. To make up an underpayment from June 19, 2002 through November 15, 2002, the defendants shall pay 21 3/7 weeks at the rate of $7.46;
 f. The defendants shall pay temporary total disability compensation from November 16, 2002 through the present, and until further order of the North Carolina Industrial Commission, at the rate of $323.74 per week.
4. A reasonable attorney's fee in the amount of 25 percent is hereby approved, to be deducted from sums due the plaintiff, and paid directly to the plaintiff's counsel in one lump sum of the accrued amount due the plaintiff, and thereafter by deducting every fourth (4th) compensation check due to the plaintiff.
5. The defendants shall pay all medical compensation reasonably related to plaintiff's compensable injuries including compensation for the plaintiff's knee injuries and right *Page 28 
knee replacement as may reasonably be required to effect a cure, give relief, and tend to lessen the period of the plaintiff's disability, according to procedures adopted by the Commission.
6. The defendants shall pay the costs of these proceedings.
This the __ day of November, 2008.
S/___________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________________ BUCK LATTIMORE COMMISSIONER
 S/___________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1